UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

      Plaintiff,

                            Criminal No. 17-20489

v.

                            Honorable Terrence G. Berg

D-12 Teeauna White,
D-18 Robin Herndon,

      Defendants.

## United States' Trial Brief

I.     **Background**

Teeauna White and Robin Herndon have been indicted for participating in a conspiracy to launder money with Maurice McCoy and others. McCoy was the leader of an extensive drug trafficking organization (DTO) with distribution hubs in multiple cities in the United States. Couriers, facilitators, and kilogram quantity customers reported to McCoy. In just two of the stash locations in Detroit and Baltimore, agents seized 52 kilograms of narcotics. Agents stopped couriers twice and seized seven more kilograms.

The DTO's drug sales generated a significant amount of cash that needed to be returned to McCoy in California. Some of that money was returned by McCoy's drug couriers, who will testify they carried large amounts of cash back to

California, which they delivered to McCoy and, at times, his girlfriend, White. In turn, McCoy and White then deposited large amounts of cash into accounts they controlled.

  

*Screen capture of McCoy and White making separate, large cash transactions*

Members of the conspiracy also funneled money to California by depositing cash into accounts in distribution hubs, withdrawing the cash in California, and turning it over to McCoy. Indeed, McCoy and White used their own business bank accounts to receive structured cash deposits in the same way. For instance, on July 28, 2017, members of the conspiracy made separate deposits—all under the $10,000 reporting threshold—of more than $60,000 cash into eight separate accounts in Baltimore (one of the DTO's distribution hubs). Included in this haul, separate $9,500 cash deposits were made into McCoy and White's Money Gang Meal Clique checking account, into White's checking account for Another Level, and into White's checking and savings accounts for her business, Pretty Pockets.

McCoy and White also used their business and personal bank accounts to structure deposits and to conceal the true source of the money being deposited. For example, on March 8, 2017, White deposited $9,000 cash into her personal checking account, while on the same day $9,000 cash was deposited into her Pretty Pockets business account, and another $9,000 cash into her Another Level business account.



*Screen capture of White depositing $9,000 into her account on March 8, 2017*

The amount of money that was deposited mostly in cash, into the various business and personal accounts McCoy and White maintained was not consistent with their reported incomes.

McCoy, White, and other co-conspirators also used their accounts to finance the purchase of flights for themselves and other DTO members to travel to or from distribution hubs, including Herndon's travel, thus promoting the ongoing illegal

activity.

McCoy and White used the cash proceeds from the drug sales to purchase expensive assets (with a value greater than $10,000) including luxury vehicles and their California residence. For example, in December 2015, White put $9,900 cash down for the purchase of a $61,000 Bentley. The down payment was just under the $10,000 threshold that would trigger a reporting requirement. Approximately $46,000 in payments were made toward the Bentley. Similarly, in June 2017, White put $15,000 cash down—split into two payments, both under $10,000—on a $96,000 Mercedes Benz. White titled the car in her name and MGMC Entertainment, a rap music label controlled by White and McCoy. Monthly payments were then made to the Mercedes, totaling approximately $26,000, from cash-funded bank accounts controlled by White and McCoy. Placing McCoy's drug proceeds into vehicles titled to White and MGMC, an ostensibly lawful public-facing entity, concealed the nature, source and location of the criminal proceeds.

In 2017, after White and McCoy selected a new house, Robin Herndon acted as a nominee to disguise the true ownership of the approximately $525,000 Moreno Valley home. Herndon also played an active role in the layered and complex web of financial transactions designed to funnel criminal proceeds to the home. To start with, McCoy obtained the initial $5,000 cashier's check for the

purchase. Herndon then assisted in the concealment of the home's true ownership by purchasing the property in the name of his company JPC Equity Properties, LLC. Herndon and co-conspirators helped fund the purchase through a newly opened JPC bank account which itself was funded by multiple other newly opened bank accounts. As cash was deposited into these accounts and moved between them, Herndon used them, and other accounts controlled by him and co-conspirators, to structure, layer, and funnel criminal proceeds to purchase and pay off the residence.



*Chart showing the movement through Herndon's nominee accounts of some of the funds used to pay for White and McCoy's residence*

## II.   Money   Laundering   Conspiracy:   General   Requirements   for Conviction

For the defendants to be found guilty of the money laundering conspiracy the government must prove that the defendants conspired or agreed with one or more persons to commit money laundering, and that the defendants knowingly and voluntarily joined the conspiracy. *United States v. Hynes*, 467 F.3d 951, 964 (6th Cir. 2006). A money laundering conspiracy does not require an overt act. *Id.* Although multiple objects of the conspiracy are charged – including to commit 18 U.S.C. § 1956 "promotional money laundering," "concealment money laundering," "evading reporting requirements," and 18 U.S.C. § 1957 violations of conducting a monetary transaction with over $10,000 in criminally derived property – the government need only prove defendants agreed with someone else to accomplish one of the illegal objects to be found guilty. Sixth Circuit Pattern Instruction 3.02; *see also United States v. Moran*, 778 F.3d 942 (11th Cir. 2015) (where indictment charged violations of § 1956(a)(1)(B)(i) and § 1957 as multiple objects of 1956(h) conspiracy, evidence need only be sufficient as to either object to sustain conviction); *United States v. Iriele*, 977 F.3d 1155 (11th Cir. 2020) (when indictment lists more than one object of conspiracy to commit money laundering, evidence need only be sufficient for any one of the charged objects to sustain a conviction); *United States v. Green*, 599 F.3d 360, 374 n.14 (4th Cir. 2010) (conviction for § 1956(h) conspiracy with multiple objects will be affirmed despite general verdict if the

evidence was sufficient to support any one of the objects); *United States v. Fuchs*, 467 F.3d 889, 906 (5th Cir. 2006) (conviction on a multi-object § 1956(h) conspiracy will be affirmed if the evidence is sufficient as to either object).

Here, White's purchase of two vehicles and both her and Herndon's involvement in the Pala Loma purchase are evidence of the conspiracy to violate Title 18, United States Code, Sections 1956 and 1957, an attempt to conceal or disguise the nature, location, source, ownership, or control of the funds—McCoy's drug proceeds—and spending statute violations.

## III.    Evidentiary Issues

### A.    Hearsay and non-hearsay

#### 1.    Non-hearsay messages of White

The government anticipates introducing text messages between White and other members of the money laundering conspiracy. Some of these communications are not being offered for the truth of any assertion, but instead to demonstrate White's awareness that she was engaged in unlawful activity. For instance, on July 11, 2017—the day after the raid in Novi—White warned another individual that "[y]our phone might be tapped now" and to "watch what you say." To the extent there's an assertion in White's text—that a phone might be tapped— the statement is not being offered to prove that assertion. Rather, it is being offered to show that White knew the conduct she was engaged in was illegal and might

7

result in wiretapping.

If the Court views this type of statement as hearsay, it is still admissible against White as a party admission. Federal Rule of Evidence 801(d)(2)(A) classifies admissions by party-opponents as non-hearsay when the "statement is offered against a party and is the party's own statement, in either an individual or representative capacity…" Therefore, the proponent of an out-of-court statement must satisfy two requirements: (1) that the statement is made by a party; and (2) that the statement is offered against that party in order for the statement to constitute non-hearsay. See Fed. R. Evid. 801(d)(2)(A). Accordingly, White's statements are non-hearsay when offered by the government.

But a defendant cannot introduce their own out-of-court statements through their own testimony or the testimony of other witnesses. See *United States v. Holden*, 558 F.3d 698, 706 (6th Cir. 2009). The defendant's out-of-court statements constitute inadmissible hearsay if offered by the defense.  Fed. R. Evid. 801(c).  Consequently, Defendants should not be allowed to introduce—or refer to—any self-serving statements, either through their own testimony or through the examination of other witnesses.  *United States v. Howard*, 216 F. App'x 463, 472-73 (6th Cir. 2007) (defendant's additional statement was not admissible under the doctrine of completeness because "[e]xculpatory hearsay may not come in solely on the basis of completeness.").

8

## 2.    Co-conspirator statements

The government will also admit text communications between other members of the money laundering conspiracy. For instance, on July 29, 2017, Co-conspirator A complained in a text that "pooidie," an individual who will be identified as Tyler Jackson, aka Pootie, did not pay her. Co-conspirator B asked "[d]id he send you all out there with money I know we have to pay u for moveing for Poodie." Co-conspirator A replied "we did talk to Loc already." The last text— that the co-conspirator had talked to McCoy, aka Loc—is an assertion and is being offered for the truth of the matter asserted. But this text is made by a co-conspirator and is in furtherance of the money laundering conspiracy. Thus it is admissible under Federal Rule of Evidence 801(d)(2)(E). *See Bourjaily v. United States*, 483 U.S. 171 (1987) (for discussion of standard of proof and court consideration of the statements themselves to determine whether a conspiracy existed).

Statements of co-conspirators are admissible against all defendants proven to be members of the conspiracy when such statements are made during the course of and in furtherance of the objectives of the conspiracy.  Fed. R. Evid. 801(d)(2)(E). Rule 801(d)(2)(E) provides that "a statement is not hearsay if the statement is offered against a party and is --- a statement by a co-conspirator of a party during the course of and in furtherance of a conspiracy."  The co-conspirator exception

requires, therefore, that the statement offered against the party be made: (1) by a co-conspirator of a party; (2) during the course of and (3) in furtherance of a conspiracy. It is unnecessary for the declarant to be charged with conspiracy before the statements will be considered in furtherance of the conspiracy. *United States v. Franklin*, 415 F.3d 317 (6th Cir. 2005) (government need not charge a conspiracy for the co-conspirator hearsay exception to apply); *United States v. Martinez*, 430 F.3d 317 (6th Cir. 2005) (even an anonymous letter can qualify as a co-conspirator statement). These determinations are preliminary questions governed by Fed. R. Evid. 104. *United States v. Enright*, 579 F.2d 980, 987 (6th Cir. 1978).

The witnesses will read excerpts of text messages to the jury that will be entered as exhibits. The Sixth Circuit has also approved of a witness "read[ing] aloud from documents that . . . [are] properly admitted"—even if there are "minor discrepancies between the reading and the written text"—as long as the jury has its own copies of the documents to review for itself. *United States v. Tragas*, 727 F.3d 610, 614 (6th Cir. 2013).

Witnesses will also testify about verbal statements made by other members of the conspiracy. These, too, are admissible under Rule 801(d)(2)(E). Following his arrest, one witness spoke to McCoy on a recorded line while in jail. The jail calls with McCoy will be entered into evidence. In addition to introducing the

recordings into evidence, the witness will also testify about the conversations.

*United States v. Branham*, 97 F. 3d 835 (6th Cir. 1996) (witness may testify to

contents of a conversation, even though a tape recording of the conversation has

already been played for the jury because the testimony corroborates the recording).

The witness will testify he is familiar with and recognized McCoy as the male

voice on the calls. The witness will explain that in the call, he and McCoy

discussed McCoy taking the witness' Cadillac Escalade to pay off a drug debt. And

in fact, later evidence will prove the Escalade was ultimately retitled into Teeauna

White's name and seized from the residence she shared with McCoy. The

statements during the call are admissible as statements in furtherance of the

conspiracy.

### 3.    Business Records

The government intends to enter business records into evidence including

flight records from various airlines, account and call detail records from phone

providers, Uber records, Sony records, hotel and casino records, a lease agreement,

and financial and tax records. The test for admission for the business record

exception is (1) the evidence was made in the course of a regularly conducted

business activity; (2) the evidence was kept in the regular course of that business;

(3) the regular practice of the business was to make the memorandum; and (4) the

memorandum was made by a person with knowledge of the transaction or

information transmitted by a person with knowledge. *United States v. Fawaz*, 881 F.2d 259, 266 (6th Cir. 1989).[1]

The records the government intends to introduce were kept in the course of a regularly conducted activity of a business and are admissible as an exception to the rule against hearsay. Fed. R. Evid. 803(6)(2).

Business records are non-testimonial and do not implicate the Confrontation Clause or violate *Crawford v. Washington*, 541 U.S. 36 (2004). *United States v. Baker*, 458, F.3d 513 (6th Cir. 2006). These records are non-testimonial because they were created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial. See *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009). This is true even if the records were produced in response to a subpoena. See *United States v. Nixon*, 694 F.3d 623 (6th Cir. 2012) (the reproduction of electronic data in a "structured and comprehensible form" [e.g. a spreadsheet] does not alter the business-record nature of the underlying data). See also *United States v. Fujii*, 301 F.3d 535, 539 (7th Cir. 2002) (computer data compiled and presented…[as] printouts prepared specifically for trial is admissible under Rule 803(6) even though the printouts themselves are not kept in the ordinary course of business).

---

[1] On October 11, 2022, the government notified the defense by US mail and email of the business records it would be admitting and of its intent to rely on Fed. R. Evid. 902(11) to admit the records.

Some of the records, such as Instagram and iCloud accounts, are also certified and self-authenticating—generated by an electronic process or system that produces an accurate result—and therefore meet the criteria of Fed. R. Evid. 902(11) and 902(13).

The government also intends to enter into evidence data downloaded from cellular devices. This data, copied from an electronic device, storage medium or file is authenticated by a process of digital identification compiled by a qualified person and therefore self-authenticating and meet the criteria of Fed. R. Evid. 902(11) and 902(14).

**B.      Authentication of social media**

The government will also prove that the Instagram and iCloud accounts that it admits are Teeauna White's. The threshold for authentication of this type of evidence is low. To authenticate an item of evidence the proponent just needs to show the item is what the proponent claims it is. Fed. R. Evid. 901(a). Evidence can be authenticated in a variety of ways, including by the appearance, contents, substance, or other distinctive characteristics of the item, taken together with all the circumstances. Fed. R. Evid. 901(b)(4). In other words, the contents itself can circumstantially authenticate the evidence. This applies to iCloud accounts and cell phones. See *United States v. Thomas*, 701 F. App'x 414 (6th Cir. 2017) (photos obtained from Facebook and Instagram admissible and authenticated because there

"was simply enough evidence presented 'to support a finding that the [photograph] [was] what the proponent claim[ed] it to be.'") (quoting Fed. R. Evid. 901(a)[2]); *United States v. Quintana*, No. 18-1231, 2019 WL 549575, at *3 (6th Cir. Feb. 12, 2019) ([authentication achieved by] pointing to facts including an account in defendant's name, an email address with his name and moniker, a location linked to defendant, dates that correspond to witness testimony, and a picture of defendant.).

## C.    Summary charts

The government intends to introduce summary charts of some of the evidence. A witness can "summarize voluminous writings or recordings."  *United States v. Kilpatrick*, 798 F.3d 365, 383 (6th Cir. 2015)). "Under Federal Rule of Evidence 1006, a party may 'use a summary…to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court,' provided that the other party has been given an opportunity to examine the entire record." *Id*. "The 'point of Rule 1006 is to avoid introducing all the documents.'" *Id*. (quoting *United States v. Faulkenberry*, 614 F.3d 573, 588–89

---

[2] Photographs from social media, which if offered by the government would be offered pursuant to Fed. R. Evid. 901(a). See *United States v. Farrad*, 895 F.3d 859, 879 (6th Cir. 2018) (photographs from social media should be admitted under the regular authentication rule 901 rather than as self-authenticating business records under Rule 902).

(6th Cir. 2010)). To avoid admitting thousands of pages of financial documents, the government will, in some instances, admit summaries of those documents under Federal Rule of Evidence 1006.

The government will also offer secondary-evidence summaries that describe the connections between different pieces of evidence. This type of summary, or "pedagogical device," is intended to summarize other evidence that has been admitted. *United States v. Bray*, 139 F.3d 1104, 1111 (6th Cir. 1998). "These secondary-evidence summaries are admitted in evidence not in lieu of the evidence they summarize but *in addition thereto,* because in the judgment of the trial court such summaries so accurately and reliably summarize complex or difficult evidence that is received in the case as to materially assist the jurors in better understanding the evidence." *Id.* at 1112 (emphasis in original).

### D.   Other Relevant Evidence

#### 1.   Evidence of Prior Drug Trafficking Convictions

In 2005, McCoy was convicted in the Central District of California (CDCA) for conspiracy to possess with intent to distribute cocaine base and cocaine. (CDCA 05-cr-00045 ECF No. 114). Tyler Jackson, a.k.a. Patrick Beasley, a.k.a. Pootie, was McCoy's co-defendant. White has claimed in court filings Jackson is like family. (ECF No. 477, PageID.3481). McCoy was sentenced to ten years imprisonment. He was placed on supervised release on

November 22, 2013. On January 19, 2016, McCoy's supervised release was revoked for his failure to report his purchase of his Porsche, which White was a listed reference for. As a result, McCoy was sentenced to six months imprisonment and continued supervision thereafter. McCoy remained on supervised release and was declared an absconder from supervision after June 4, 2019.

Introducing McCoy's prior conviction as part of the government's case in chief could have been prejudicial under Fed. R. Evid. 403 against McCoy[3], but it is not as it relates to White and Herndon. Rather, it is relevant under Fed. R. Evid. 401. White has a child in common with McCoy and was in a relationship with him while he was being supervised for his prior drug offense. McCoy and Herndon are related. The government must show as part of their agreement to launder monetary instruments, which included McCoy, that White and Herndon knew the proceeds represented some form of illegal activity. Therefore, the limited reference to McCoy's prior conviction and supervised release violation have a tendency to make a fact—White and Herndon's knowledge the proceeds represented some form of illegal activity—more probable than it would be without

---

[3] Had McCoy proceeded to trial and the government had to prove his prior convictions for sentencing purposes under 21 U.S.C. § 851 it would have done so in a bifurcated manner, only presenting such evidence if the jury convicted McCoy of the drug conspiracy.

the evidence, and the fact is of consequence in determining the action, meeting the minimal requirements for relevance. See Fed. R. Evid. 401.

### 2.    Evidence of unexplained wealth

The government intends to introduce conspirators' tax returns to show their spending and accumulation of assets was inconsistent with their reported incomes. This circuit has allowed the introduction of this type of evidence. See *United States v. Layne*, 192 F.3d 556, 574 (6th Cir.1992) ("the admission of income tax returns is permissible . . . in narcotics cases where the defendant engaged in extravagant spending or possessed massive unreported wealth.  In [this] kind of case, the government may use the lack of a federal tax filing or the underreporting of income in combination with evidence of extravagance to create 'the inference that the defendant does not possess a legitimate source of income to support his affluent lifestyle and, therefore, the income must originate from narcotics operations.'"); *United States v. King*, 169 F.3d 1035, 1039 (6th Cir. 1999) (drug dealer's lack of sufficient income to explain large wire transfers implies wired money was drug proceeds); *United States v. Logan*, 542 F. App'x. 484, 495 (6th Cir. 2013) (failure to file tax return is relevant to existence of, and defendant's participation in, money laundering conspiracy).

### 3.    Evidence of Flight

The government intends to introduce evidence that White harbored McCoy

after their indictment and her arrest. On June 4, 2019, law enforcement searched McCoy and White's residence. They also arrested White, who subsequently appeared in court in California to be arraigned on the Sixth Superseding Indictment, which listed McCoy as a co-defendant. (ECF No. 199).  McCoy was not arrested that day and, instead, eluded law enforcement until he was arrested after running from a vehicle with White three months later.

White is now alleged to have participated in the money laundering conspiracy until, at least, the date of McCoy's arrest. She knew McCoy was wanted since she appeared in court and her indictment was unsealed on June 4, 2019. By harboring McCoy, she not only assisted her co-conspirator avoid capture, she prevented law enforcement from obtaining evidence—either through interviews or seizures—that might incriminate her.

In addition, White's continued association with McCoy while he was on the run undermines her anticipated argument that she was unaware he was involved in criminal conduct during the conspiracy. This evidence is not unfairly prejudicial, nor likely to confuse the issues or mislead the jury. Fed. R. Evid. 403. Additionally, the Court may provide a slightly modified cautionary instruction consistent with Sixth Circuit Pattern Instruction 7.14.

### 4.    2015 Homicide

One DTO member's girlfriend, K.G., was murdered in 2015 in Jackson,

Michigan. The homicide remains unsolved. The government does not intend to make reference to the killing during any witnesses' testimony. The defense should likewise not question witnesses about the speculative details of the homicide.

### 5.    Witnesses Prior Convictions

One witness has prior convictions that include accessory to an assault (2008), two burglaries[4] (2009), willful resistance/delay/obstruction for running from the police[5] (2009), and driving under the influence (2013). The witness cannot be impeached for those convictions under Federal Rule of Evidence 609. Defense counsel should be precluded from inquiring about these prior convictions.

A witness's character for truthfulness can be attacked by evidence of a criminal conviction if that conviction meets certain criteria. The conviction must either: (1) be punishable by death or imprisonment of more than one year and its probative value substantially outweighs any potential prejudice; *See* Fed. R. Evid. 609(a)(1)(A) and Fed. R. Evid. 403; or (2) regardless of punishment an element of the prior conviction required proof or an admission of a dishonest act or false statement. *See* Fed. R. Evid. 609(2).

The Sixth Circuit has adopted the position that theft and related crimes do

---

[4] While one of the convictions is listed as burglary the underlying facts are related to shop lifting.

[5] The witness was also charged with providing false identification, but it was dismissed. This could be admissible under Fed. R. Evid. 608, but no extrinsic evidence of the conviction could be entered.

not ordinarily amount to crimes of dishonesty or false statement. In *United States v. Washington*, 702 F.3d 886 (2012), the Court held "Rule 609 is intended to inform fact-finders that the witness has a propensity to lie, and as morally repugnant as some crimes may be, crimes of violence or stealth have little bearing on a witness's character for truthfulness." *Id.* at 893. 2. See also *United States v. Scisney*, 885 F.2d 325, 326 (1989) (shoplifting "was not the type of conviction involving dishonesty or false statement anticipated by the rule and…should not be allowed.").

## III.   Witnesses

### A. Opinion Testimony

Several witnesses will offer opinion testimony at trial[6].

- DEA SA Jeremy Fitch will offer fact testimony about this investigation and opinion testimony about drug traffickers' common practices and behaviors.

- IRS SA Derek Newsome will describe the federal requirements to report certain cash transactions and offer fact testimony about his review of financial records. He will also testify about the flow of

---

[6] Pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G), the government provided notice to the defense of its intent to offer opinion testimony under Federal Rules of Evidence 702, 703, and 705 and via email and mail on October 13, 2022, and requested reciprocal discovery.

funds between accounts and the accumulation of assets as inconsistent with McCoy and White's reported incomes.

- Retired IRS Special Agent Frank Scartozzi will testify about why financial institutions have to file Currency Transaction Reports (CTRs) and how individuals involved in criminal activity structure cash deposits and why evading reporting requirements would assist an individual in hiding cash or assets. Relatedly, he will explain how cash-based businesses are used by those involved in criminal activity to conceal or to disguise the nature, location, source, ownership, or control of illegal proceeds. Scartozzi will also explain how individuals involved in drug trafficking often fail to file tax returns or file fraudulent tax returns in an effort to conceal their criminal activity. Scartozzi will also explain how individuals involved in drug trafficking often accumulate valuable assets, sometimes in other individuals' or entity's names, including real property, in an effort to conceal or disguise the nature, location, source, ownership, or control of the proceeds derived from criminal activity. He will also explain how the purchase of assets with criminal proceeds, if it exceeds a monetary amount, violates a criminal statute. Scartozzi will also explain how criminal proceeds

or activities of conspirators are used to further promote the

continuation of the underlying criminal activity. Lastly, he will

also identify specific transactions that were structured in his

opinion to avoid a reporting requirement or done in an effort to

disguise the nature, location, source, ownership, or control of the

funds, or done to promote the underlying criminal activity, or that

violated the spending statute.

For any witness the government intends to have offer fact and opinion

testimony, the government will delineate for the jury when it is shifting between

factual and opinion testimony. The government requests that the Court read Sixth

Circuit Pattern Instruction 7.03A before a witness provides factual testimony.

Likewise, if the defense intends to offer any opinion witness at trial, they

should not seek to have the witness qualified as an expert in the jury's presence or

refer to them as such during the trial. If the defense intends to have a witness

testify to facts and opinion, they should delineate for the jury when it is shifting

from opinion to factual testimony and the Court should read Sixth Circuit Pattern

Instruction 7.03A.

### B.    Recalling the case agent

The government intends to recall one of the case agents, IRS Special Agent

Derek Newsome, to the stand twice during the trial. This case involves a lengthy

22

conspiracy with discrete incidents and the government intends to call SA Newsome after some of them testify about pertinent related evidence. This will allow for a more efficient presentation of evidence that the jury will understand, rather than waiting until the end to offer voluminous testimony.

Federal Rule of Evidence 611(a) allows a district court to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence," as long as it "make[s] the interrogation and presentation effective for the ascertainment of the truth." Fed. R. Evid. 611(a); *see also United States v. Lash*, 937 F.2d 1077, 1087 (6th Cir. 1991) ("The district court must have considerable discretion in controlling the mode and order of the proof at trial"). A defendant's Sixth Amendment rights are appropriately safeguarded by allowing the defendant to cross-examine the witness after each appearance. *United States v. Jackson*, 549 F.2d 517, 528–29 (8th Cir. 1977).

This is a commonly accepted practice in the Eastern District. *See, e.g.*, *United States v. Nagi, et al.,* Case No. 06-20465; *United States v. Kilpatrick et al.*, Case No. 10-20403; *United States v. Beasley et al.*, Case No. 12-20030; *United States v. Ramiah Jefferson et al.*, Case No. 14-20119. *United States v. Arnold et al*, Case No. 15-20652; *United States v. Bell et al*, Case No. 17-20183.

Respectfully submitted,

Dawn N. Ison
United States Attorney

23

*s/ Andrea Hutting*
Andrea Hutting
Craig F. Wininger
Gjon Juncag
Assistant United States Attorneys
211 W. Fort St. Suite 2001
Detroit, Michigan 48226
313-226-9110 phone
Andrea.hutting@usdoj.gov

Dated: November 7, 2022

Certificate of Service

I hereby certify that on November 7, 2022, I electronically filed the

foregoing document with the Clerk of the Court using the CM/ECF system that

will provide notice to opposing counsel of record.

> _s/ Andrea Hutting_
> Andrea Hutting
> Assistant United States Attorney
> 211 W. Fort St. Suite 2001
> Detroit, Michigan 48226
> 313-226-9110 phone
> Andrea.hutting@usdoj.gov